Judge Max N. Tobias, Jr.
hThe matter before us concerns three separate judgments and one motion that were consolidated on appeal. As such, each consolidated case presents distinct issues. After setting forth the facts, we discuss each case and its issues separately.

FACTS AND PROCEDURAL HISTORY

The Accident and Injuries

On 1 July 2010, the plaintiff/appellant (Case No. 2015-CA-0159),[1] Lisa Plaia (“Ms. Plaia”) had dropped her toddler, Carolina, off at a daycare facility operated by the First Baptist Church of New Orleans (“FBCNO”).[2] As Ms. Plaia was driving away with her four-year-old daughter, Petra, in the backseat, a solid steel traffic pole gate swung into the roád and pierced the windshield of Ms.'Plaia’s vehicle. The force was sufficient to sever her seatbelt and struck her on the right side of her face. A bystander helped apply pressure to her wound while waiting for |athe paramedics to arrive. Petra remained secured in the backseat throughout the ordeal.
Ms. Plaia was taken by ambulance to Ochsner Hospital for treatment, where she remained for five days. As alleged by the plaintiffs, her injuries included, four skull fractures, the partial severance of her'ear, a crushed ear canal, severe right facial trauma, right facial nervé weakness, and a hematoma that was drained into a bucket by her hospital bed. The plaintiffs maintain that Ms. Plaia developed facial nerve weakness; Bell’s palsy, including partial facial paralysis, chronic pain and headaches, trigeminal neuralgia problems with her salivary glands, hearing loss, permanent facial disfigurement, and a temporo-mandibular (“TMJ”) disorder that requires the constant wearing of a splint. Later, the plaintiffs asserted that Ms. Plaia had also suffered a traumatic brain injury that caused permanent deficits in memory, concentration, and attention.
Following the accident, the plaintiffs filed suit against three distinct defendant entities and their insurers: Fireman’s Charitable & Benevolent Association (“FCBA”), and its insurers, Lafayette Insurance Company, arid United Fire Group; Stewart Enterprises, Inc. (“Stewart Enterprises”), and Greenwood Funeral Home (collectively “Stewart Enterprises” [if appropriate in context]” or “funeral defendants”); and FBCNO and Church Mutual Insurance Company (“CMIC”). Stewart Enterprises is the parent company of both S.E. Funeral Homes of Louisiana, LLC *486 (“SEFH”), and S.E. Cemeteries of Louisiana, LLC. SEFH was added as a defendant 'in the plaintiffs’ first supplemental and amending petition, as lathe owner and operator of Greenwood Funeral Home. SEFH was dismissed from the initial action on 9 April 2013. All cross claims and third-party demands against it were dismissed on 2 May 2014.

The Leases and Actions of the Various Defendants

The land on which the accident took place is owned by FCBA. In 1992, FCBA entered into a base lease for a portion of the property with the funeral defendants (“base lease”). In 2004, SEFH entered into a sublease (“Sublease”) with FBCNO as sublessee and FCBA as “intervenor.” At the same time, FCBA entered into a ground lease with FBCNO (“Cherry Street lease”). This came about because FCBNO bought some property in the rear of the Greenwood Cemetery to build a church. It was discovered that the access road they planned to use was not adequate for the church’s needs. As a result, FBCNO approached FCBA requesting permission to build a road to the cemetery that would connect the church facilities to Canal Boulevard.
FCBA denied the request on three occasions. Later, it learned that FBCNO had spoken with the funeral defendants whereby the road would go through the land leased under the base lease; the funeral defendants put pressure on FCBA and it finally agreed.
In order to approve the plan to construct an access road, FCBA required that swinging arm barricade gates be installed to prevent access from the roadway to be built onto Cherry and/or Osier Streets and the cemetery after it closed at 5:00 p.m. Ldaily.[3] FBCNO attached architectural plans to the signed lease showing exactly how the gates would be built and exactly where they would be located; FCBA and the funeral defendants approved the plans. The gates, as well as the gate posts on which they pivot, were installed on the property covered by the Cherry Street lease. As originally constructed under the terms of the leases, no tie posts were installed to keep the gates secured open.
Because of the way the gates were designed and located, they had to swing through the access road to be opened and closed. After a similar accident in late 2004,[4] two wooden posts or “tie posts” were installed on the property; one post was located on property covered by the Cherry Street lease and the other on property covered by the Sublease just over the boundary of the land covered under the Cherry Street lease. At the time of the accident, the gates were secured to the tie posts with metallic snap shackles when open during the day. Reverend Robert R. Moore of FBCNO testified that the same architect who designed the gates also designed the tie posts.[5] Once Reverend Moore received the tie-post design in November 2004, it was forwarded to FCBA. Reverend Moore testified that the church did not build the tie posts or determine how the gates would be kept open. He acknowledged, however, that the tie post *487 plan called for a padlock to be used to |Rkeep the gates open during the day. He ■was never given a combination or key that could be used on a padlock, if one had been installed.
The record reveals that, in November 2004, Reverend Moore sent the plans to FCBA’s attorney who forwarded them to John C. Freese, Jr., FCBA’s secretary-treasurer, by letter. The attorney’s cover letter stated that “they,” meaning the church, would- “fix the gates so that the gates no longer blow open.”
Mr. Freese testified that, to his knowledge, no one from FCBA installed the tie posts, but stated that he had -seen the plans for same that showed the use of a padlock. He admitted that he never communicated to the sexton of the cemetery, Patrick John Gately, that the plans indicated that a padlock should be used. Mr. Freese said that there was no need to have a lock on the wooden post itself because the snap bolt was “sufficient to hold all that up.” He agreed .that at one time they had used some bungee cords, and even a dog leash with a snap bolt on the end of it, which they would wrap around and keep the gates open during the day. During the time the snap bolts were used, no problem existed with that gate until the day of Ms. Plaia’s accident on 1 July 2010. Mr. Freese believed that the tie posts were erected about two weeks after the November 2004 accident. He also stated that he never told anyone else at FCBA that the architect’s design of the tie post called for a padlock.
Mr. Gately, as sexton of the cemetery, made all the arrangements for funerals that were held at Greenwood Cemetery. He regularly opened the subject gates, among others, every morning and did so on the morning in question. He ^testified that he knew that the gates could be very dangerous, so he secured- the latches to keep them open every morning when he opened them.
Mr. Gately testified that FBCA had possibly modified the gate in question. He also admitted that both bungee cords and dog leashes had been used to secure the' gate to the tie post over the years. He testified that he himself put a latch on the gate so it could.be secured to the tie post.
It was further established that, on the date of the accident, landscape personnel employed' by Stewart Enterprises were present at the site of the gates and tie post cutting grass. As will be covered more in depth infra, testimony at trial indicates that an unidentified landscaper was seen unlatching the gate on the morning of the accident and had been seen doing so in the past. The landscapers, some of whom testified at trial, all denied touching the gate in question.
As a result of the accident and various clauses in the respective leases, the defendants filed cross-claims and third-party demands against each other for defense costs and indemnity; those issues were tried separately in April 2014, with a separate judgment being- rendered and signed in May 2014. That judgment determined that the accident implicated the Sublease; .pursuant to the Sublease, FBCNO owed indemnity and defense costs to both FCBA and SEFH. FBCNO took an appeal from that judgment (Case No. 2014-CA-0746).[6] *488 In September |72015, the trial court assessed costs and attorneys’ fees' against the FBCNO; it filed a second appeal from that judgment (Case No. 2015-CA-1I76).
■ Length of the Trial
A trial by jury was originally scheduled for 15 April 2013, but then reset for 22' April 2013. The parties’ pretrial outline estimated that the trial would take two weeks, although one-defendant estimated that three weeks would be needed. Thus, it-was scheduled for two weeks with-the possibility of continuing into, a third week. On 19 April 2013, some of the defendants moved for a, continuance when a previously scheduled jury trial was still ongoing. The defendants requested that the trial be reset for the next three-week period when all the parties and 'the court would be available. On 23 April 2013, the trial court, sua sponte, ordered the trial be moved to 5 August 2013, due to an absence of jurors sufficient to serve for a three-week trial In an email to all counsel, the court stated:
After careful consideration, the Court cannot go forward with the Lisa Plaia trial at this time, This Court has learned that it has gone through the entire venire of the jury-panel and cannot get new jurors to serve for a three-week trial. Based upon the circumstances,-the Court is sua sponte ordering that the trial scheduled originally for April 15 is being moved to •August 5, 2013. Please note that adherence to the scheduling order will remain in full effect- and any motions that could have been filed on the dis-positive *rüle date previously set will-be denied outright. As such, this Court will consider as moot all motion practice to continue trial. [Emphasis supplied.] '
On 25 July 2013, a pretrial conference was held to dispose of motions that had been filed. At the hearing, all counsel confirmed their understanding that the | «trial could take approximately 15 trial days. The trial court, however, stated that the trial would be set for 10 trial days. The justification for the ruling appears to be that one defense attorney questioned whether even 15 days would be Tong enough. The trial court stated:
When somebody suggested 15, Mr. Marshall said he didn’t think that was enough. So, my thing -was, I’m going to give you what you-all signed up for. Y’all signed-up-for 10 days.... So, if you can’t- do it in 15 days, then I’m going to give you what you asked for. I’m going to -give you what you-all signed up for [in the April pretrial outline],.-.. You’re the ones what scheduled this, And, certainly, there shouldn’t be a whole ton of the same questions asked to class [ ] representative. This is not my first big trial.Okay? And I don’t know what y’all are talking about. I go[t] asbestos out the [“]wazoo.[”]. I got three the remainder of the year.

The Trial

The primary case came on for jury trial in August 2013. It took the plaintiffs approximately six days to present their case in chief. The trial court refused to allow Mr. Plaia to testify, even though a named plaintiff, because they had run out of the time allotted to them. In fact, the trial court told the plaintiffs that Ms. Plaia *489 would be their last witness on the day before she actually testified. The plaintiffs also wanted to present the testimony of a medical expert originally hired by the defendants, as well as other family members to testify as to Ms. Plaia’s alleged brain injury.[7] A neurological expert, Michael Puente, M.D., originally retained by one of the defendants, was present in the courtroom on the last day the plaintiffs were given to present their case in chief. Despite assurances that Dr. Puente’s | fltestimony would take no longer than five minutes, the trial court disallowed his testimony.
At the close of the defendants’ case, the trial court granted a directed verdict on Mr. Plaia’s claim for loss of consortium and on Petra Plaia’s claim, for bystander damages .(also .known as Lejeune damages). As noted previously, Petra was in the car with her mother when the accident happened. The trial court based its directed verdict on Mr. Plaia’s loss of consortium claim because Mr. Plaia was available but did not testify to his damages. As .for Petra’s Lejeune damages, the trial court stated that no evidence existed to show that the harm Petra suffered was severe and debilitating.
The jury returned a verdict in favor of the plaintiffs. It found Ms. Plaia free from fault and assessed fault among three of the defendants: FGBA, 42.5%; FBCNO, 42.5%; and Stewart Enterprises, 15%. The jury awarded damages as follows:
Past physical pain and suffering $250,000
Future physical pain and suffering 250,000
Past medical expenses 143,000
Future medical expenses 127.000
TOTAL $770,000
The jury awarded no damages for permanent scarring and disfigurement, past and future mental pain and suffering, disability, past and future enjoyment of life, as well as loss .of future income and earning capacity. The jury also declined to award damages to the Plaia children, Petra and Carolina, for their own loss of consortium claims.
. The plaintiffs filed a motion for judgment notwithstanding the verdict (“JNOV”), as well as a motion for new trial or alternatively for additur. The trial court denied the motion for JNOV and for new trial, .but partially granted the|10motion for additur, awarding Ms. Plaia the sum of $10,000 for her permanent scarring. This timely appeal followed.

PLAINTIFFS’ APPEAL IN NO. 14-CA-0159

The plaintiffs have assigned five errors committed by the trial court. The first two involve the time constraints placed on the plaintiffs to present their case. They allege that the trial court violated Mr. Plaia’s due process rights and prevented the plaintiffs from properly presenting all their necessary and relevant evidence. We address these first.
, Discussion of Assignments of Error One and Two
The record reveals, that, the length-of this trial was discussed between all counsel and the trial court. In the pretrial order, the parties: said 10 days (two weeks) was *490 sufficient. Later, one of the defense attorneys said he thought that possibly more than 15 days (three weeks) would be needed.
In April 2013, the' trial court acknowledged that three weeks should be set aside to try this case. However, one week before the trial, the court decided that the parties would have a total of 10 days to present their respective cases. Although the parties argued that they were led to believe that a total of 15 days would be set aside for the trial, the trial court disagreed. The plaintiffs contend that the time constraints were prejudicial, unreasonable, and deprived Mr. Plaia of his due process right to be heard.’
Contrariwise, the defendants argue that the plaintiffs engaged in poor time management, called witnesses who had no relevant testimony to help the plaintiffs’ case, and elicited cumulative testimony. They assert that, as recognized by the trial court, Mr. Plaia was present in the courtroom throughout the entire trial and could have testified at any time. Thus, they maintain that the'failure to put Mr. Plaia on Inthe stand was a strategic and logical decision by counsel, and thus Mr, Plaia’s constitutional rights were not violated.
’ We begin with La. Const. Art.' I, § 22, which reads as follows:
All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights.
La. C.C.P. art. 163Í A also has bearing on this issué, and states in relevant part:
The court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings as the trial, so that justice is done.
We recognize a trial court has the discretion to control its docket and, thus, place reasonable time limits on the amount of time allotted to try a case so that all litigants have fair access to the court. However, that limit must allow a party to present evidence to support the litigant’s case.
While this precise issue of time limits has never been addressed by this court, our brethren in the Second Circuit have considered the issue of time limitations on the presentation of evidence by a party. In Goodwin v. Goodwin, 618 So.2d 579, 583-84 (La.App. 2nd Cir.1993), writ denied, 623 So.2d 1340 (La.1983), the court identified' certain non-exclusive guidelines to be followed by a trial court should it decide to place such time limitations. These are: (1) litigants have a general right to present all evidence he/she possesses with regard to the contested issue at trial that is relevant, admissible, and hot cumulative, tempered by La. C.E, | iaart. 403;[8] (2) before imposing time limitations, the trial judge should be thoroughly familiar with the Case through pretrial proceedings,, including status conferences, pretrial conferences, and discovery; (3) if time limitations are used, time limits should normally be imposed on all parties, before any party presents any evidence, and sufficiently in advance of trial for the litigants to prepare for trial within the limits imposed; (4) the trial judge should inform the parties before the trial begins that reasonable extensions of the time limits will be granted for good cause shown; (5) the trial judge should develop an equitable method of charging time *491 against each litigant’s time limits. Rather than charging each side for the total time used to present its case, the judge should generally charge each party for the time the litigant uses, whether it be used on direct or cross-examination; and (6) the trial judge' should put all of the court’s rulings regarding time limitations and the reasons for the rulings on the record.[9]
We now apply these guidelines to the facts of this case. First, we find that the plaintiffs were prevented from presenting all relevant, admissible, and noncumulative evidence in the time allotted to them. The trial court made no finding on the record that the plaintiffs were wasting time or unduly trying to delay the trial. Discussions off-the-record and outside the presence of the jury were involved at times; the defendants obviously participated in those conversations. In addition, the plaintiffs could not accurately estimate how long it would take for defendants to cross-examine their witnesses. Finally, as pointed out near the close of the plaintiffs’ case, it was discussed that some of the witnesses presented by the | ^plaintiffs helped the defendants to place liability for the accident on other defendants. This guideline militates towards a finding that the plaintiffs were denied due process.
; Second, we find no evidence that the trial court was unfamiliar with the case and the claims of the parties. However, the last minute change from a three-week trial to a two-week trial appears arbitrary based on the 25 July 2013 hearing transcript. The trial court knew that the contested traumatic" brain injury .portion of the evidence would take time to establish and refute. This guideline is somewhat neutral.
The third guideline discusses that time limits should normally be imposed sufficiently before trial to allow the litigants to prepare accordingly. Here, the parties were reasonably led to believe that the trial would take 15 days. However, one week before trial, they were told that only 10 days were available. We also find no reason stated by the judge that warranted the change, but for one defénse- counsel stating that he thought the trial would go longer than 15 days. This guideline supports a finding of a denial of due process.
The fourth guideline states that reasonable extensions of time should be granted for good cause. In the case at bar, good cause existed for a reasonable extension. In fact, the trial transcript reflects that the plaintiffs were cutting witnesses throughout their case in chief to present the most important evidence. No extension was even considered by the trial court. Again, this guideline supports a finding that the plaintiffs were denied due process.
11 ¿Guideline five states that, the trial judge should use an equitable method .of charging time against each litigant’s time limits, taking into account the time used for both direct and cross examinations. It was brought to the court’s attention that the cross examination of several of the plaintiffs’ witnesses would focus on the allocation of fault among the defendants. In this way, the plaintiffs’ case took longer to present and shortened the time the defendants would need. However, the defendants would not be calling some of the witnesses the plaintiffs needed to establish Ms. Plaia’s behavioral and cognitive *492 changes, namely her husband and close family members. In addition, because there were multiple defendants defended by different counsel, cross examination took longer than it would have if only one defendant were involved. This time was not attributed to the respective defendants but to the plaintiffs. This guideline weighs in favor of a finding that due process was denied.'
Finally, guideline six recommends that all rulings.on the issue of time limits and the rationales behind them be placed on the record. That was not done in every instance; however, this, guideline alone does not require that we find merit in the plaintiffs’ argument.
We further address the inability of the plaintiffs, to present the testimony of Dr. Puente, a doctor originally retained as an expert by the defendants whose opinion was arguably unfavorable to them. By disallowing Dr. Puente’s testimony, the defendants argued to the jury that only medical experts hired by the plaintiffs’ attorneys found that Ms. Plaia suffered a traumatic brain injury in the accident. With Dr. Puente’s testimony, the plaintiffs allege that they could have rebutted that argument and presented relevant testimony to the jury.
|15Pr. Puente’s reports dated 21 December 2012 and 2 January 2013 were proffered by the plaintiffs as Proffer No. 15.[10] We have reviewed these reports. As part of his IME, Dr. Puente reviewed all of Ms. Plaia’s medical records, including the MRIs in question and performed a physical exam of Ms. Plaia. In his 21 December 2012 report, Dr. Puente states:
With regard to my own review of the MRI studies, I would concur that the MRI from March of 2011 is normal. The MRI of October 2012 does appear to show some right sided temporal lobe atrophy as well as mild frontal lobe atrophy mostly on the right side. I do not note any asymmetry of the lateral ventricles or temporal horns, however.
⅜ * #
[Biased on the abnormal MRI of the brain dated October 2012, it appears [she] suffered some degree of focal brain injury, I am not sure how else tó explain the discrepancy and the change between the two studies.
Dr. Puente noted, however, that he “did not pick up on any issues suggesting neu-rocognitive dysfunction and/or memory problems either on my examination or even upon questioning of the patient., Following his initial report, Dr. Puente was sent and reviewed the films of a CT scan of the brain performed on Ms. Plaia on 1 July 2010,- the date of the accident. In his subsequent report he stated:
I do note that the right temporal horn is slightly larger than the left suggesting that the temporal lobe asymmetry may well be developmental in nature and thus predate, her trauma of July 2010. .... As such, I would defer to a radiologist as to whether the asymbietry noted on subsequently MRI studies of the brain are more of the same or evidence of a significant change.
I mlt is undisputed that Dr. Puente was retained by one of the defendants but was not used as a defense witness. We cannot say, based on the two proffered reports, that his testimony would or would not *493 have supported the plaintiffs’ allegations that Ms. Plaia suffered a traumatic brain injury as a result of the accident; that is an issue for the jury. We further cannot opine that Dr. Puente was not called as a defense witness based on his initial report of December 2012 because in the report in January 2013, he deferred to radiologists reading the film. Contrary testimony from radiologists was presented by the parties.
However, if Dr. Puente’s actual testimony would have supported the finding of a traumatic brain injury, the plaintiffs were required to proffer his testimony in addition to his reports.
La. C.C.P. art. 1636 provides a procedure to offer evidence when it is deemed inadmissible by the trial court. It states in pertinent part:
A. When the court rules against the admissibility of any evidence, it shall either permit the party offering such evidence to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence.
B. At the request of any party, the court may allow any excluded evidence to be offered, subject to cross-examination: on the record during a recess or such other time as the court shall designate; or by deposition taken before a person authorized by Article 1434 within thirty days subsequent to the exclusion of any such evidence or the completion of the trial or hearing, whichever is later. When the record is completed during a recess or other designated time,: or by deposition, there will be no necessity for the requesting party to make a statement setting forth the nature of the evidence.
C.In all cases, the court shall state the reason for its ruling as to the inadmissibility of the evidence. This ruling , shall be reviewable on appeal without the necessity, of further formality. [Emphasis supplied.]
hyAfter -considering the Goodwin factors, we find that .the trial court’s time limitations were arbitrary and unreasonable in this matter. It is troubling that the trial court stated in an email to all parties that 15 days would be set aside for the trial, just to be changed to 10 just one week prior to the trial’s start date. Unquestionably, the exclusion of the testimony of Mr. Plaia, a named plaintiff, had a direct impact on the loss of consortium claims asserted by him and his minor children. The exclusion of Mr. Plaia’s testimony also impacted the grant of directed verdicts discussed below. And we cannot say and cannot know whether Mr. Plaia’s testimony'would have benefited the other plaintiffs, especially Ms. Plaia’s claim for damages.
The. exclusion of testimony from Mr. Plaia, Dr. Puente, and other family members impacted every element of damages awarded by the jury.[11] The medical evidence was evenly split between a finding of a head, injury and against such a finding. ‘The disallowed testimony might have resulted in a finding that Ms, Plaia did in fact sustain a traumatic brain’injury when she was struck by the swinging gate.
Consequently, we find that an application of these guidelines mandates that we remand the matter for a new trial on the issue of damages.

Discussion of Assignments of Error Three and Four

The third and fourth assignments of error concern the directed verdicts in *494 favor of the defendants on Mr. Plaia’s loss of consortium claim and Petra Plaia’s claim for Lejeune bystander damages. Because we have already found that the plaintiffs were denied due process by the unreasonable and prejudicial time | ^limitations placed on them, we further find that the trial court erred by granting the directed verdicts.
Louisiana Code of Civil Procedure article 1810 provides that:
[a] party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for directed verdict is effective without any assent of the jury.
“A motion for directed verdict under La. C.C.P. art. 1810 is properly granted if in viewing the facts in the light most favorable to the adverse party, the trial court concludes that the evidence is such that reasonable, fair-minded jurors cannot arrive at a verdict in favor of the non-moving party.” Lozano v. Touro Infirmary, 99-2587, p. 6 (La.App. 4 Cir. 12/13/00), 778 So.2d 604, 607. “[I]f there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case should be submitted to the jury.” Lott v. Lebon, 96-1328, p. 4 (La.App. 4 Cir. 1/15/97), 687 So.2d 612, 616; Walker v. Louisiana Health Management Co., 94-1396, p. 8 (LaApp. 1 Cir. 12/15/95), 666 So.2d 415, 421. Evaluations of credibility should not be considered unless the opposing party failed to produce sufficient evidence upon which reasonable and fair-minded persons could disagree. Id.
1,A directed verdict must be evaluated in the light of the substantive law underpinning the plaintiffs claim. Burris v. Wal-Mart Stores, Inc., 94-0921, p. 5 (La.App. 1 Cir. 3/3/95), 652 So.2d 558, 561. The standard of review for directed verdicts is whether, after viewing the evidence submitted, the appellate court concludes that reasonable people could not reach a contrary verdict. Lott, 96-1328, p. 4, 687 So.2d at 616. A directed verdict should be sustained on appeal where the reviewing court would find a jury verdict in favor of the party opposing the motion to be manifestly erroneous had the trial judge allowed the case to go to the jury. See Wichser v. Trosclair, 99-1929, p. 5 (La. App. 4 Cir. 2/28/01), 789 So.2d 24, 27.
Loss of consortium claims[12] encompass the following seven items: (1) loss of love and affection; (2) loss of society and companionship; (3) impairment of sexual relations; (4) loss of performance of material services; (5) loss of financial support; (6) loss of aid and assistance; and (7) loss of fidelity. Ritter v. Exxon Mobile Corp., 08-01404, p. 11 (LaApp. 4 Cir. 9/9/09), 20 So.3d 540, 547 [citation omitted]. “Not every physical injury will result in a loss of consortium or other general damages.” Thonn v. Cook, 03-0763, p. 15 (La. App. 4 Cir. 12/10/03), 863 So.2d 628, 640 [citations omitted]. “The operative question is whether the fact finder abused its *495 great discretion in finding that the plaintiff failed to prove compensable loss of consortium.”
In this matter, Mr. Plaia was prevented from testifying. Without his testimony, he could not present evidence of his loss of consortium claim. We also find that Mr. Plaia’s testimony could have shed light on the loss of consortium |anclaims of both minor children who were awarded nothing by the jury. Even further, Mr. Plaia’s testimony could have affected the plaintiffs’ claim that Ms. Plaia suffered a traumatic brain injury. Thus, we set aside the directed verdict and remand the issue to the trial court for Mr. Plaia’s testimony. The children’s claims for loss of consortium set as zero by the jury are likewise set aside and remanded for further proceedings.
We find similarly with respect to Petra’s Lejeune bystander damages. La. C.C. ar,t. 2315.6 states in relevant part:
A. The following persons who view an event causing injury to another person, or who come upon the scene of the event soon thereafter, may recover damages for mental anguish or emotional distress that they suffer as a result of the other person’s injury:
(1) The spouse, child or children, and grandchild or grandchildren of the injured person, or either the spouse, the child or children, or the grandchild or grandchildren of the injured person.
* ⅜ ⅜
B. To recover for mental anguish or emotional distress under this Article, the injured person must suffer such harm that one can reasonably expect a person in the claimant’s position to suffer serious mental anguish or emotional distress from the experience, and the claimant’s mental anguish or emotional distress must be severe, debilitating, and foreseeable. Damages suffered as a result of mental anguish or emotional distress for injury to another shall be recovered only in accordance with this Article. [Emphasis supplied.]
This article is statutory authority for bystander or “Lejeune ” damages. Per Lejeune v. Rayne Branch Hosp,, 556 So.2d 559, 570 (La.1990), to recover bystander damages, (a) one must “either view the accident or injury-causing event or come upon the accident scene soon thereafter and before substantial change has occurred in the victim’s condition ...; (b) [t]he direct victim of the traumatic injury must suffer such harm that it can reasonably be expected that one in the plaintiffs 12iposition would suffer serious mental anguish from the experience ...; (c) [t]he emotional distress sustained must be both serious and reasonably foreseeable to allow recovery, ... going well beyond simple mental pain and anguish ... [,]for the emotional injury ... must be both severe and debilitating;” [and] (d) all claimants must have a close relationship with the victim. Id. at 570.
Again, Mr. Plaia’s testimony could have elaborated on Ms. Plaia’s limited time on the stand, who testified that Petra appeared to be in a state of shock at and following the accident. Because we find that Mr. Plaia was improperly denied the opportunity to take the stand, we also set aside this directed verdict and remand the issue for Mr. Plaia’s testimony.

Discussion on Assignment of Error Five

The plaintiffs argue that the trial court erred when it denied its motions for JNOV, alternatively new trial or, alternatively, additur on general damages. In particular, the plaintiffs sought an award of damages for Ms. Plaia’s closed head injury that she allegedly suffered in the accident.
*496 In Show and Tell of New Orleans, L.L.C. v. Fellowship Missionary Baptist Church, 15-0068, pp. 17-18, (La.App. 4 Cir. 6/24/15), 171 So.3d 1136, 1145-46, we stated:
La. Code of Civil Procedure art. 1811(F)provides the authority for a JNOV. A judgment notwithstanding the verdict is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that rear sonable jurors could not arrive at a contrary verdict. Anderson v. New Orleans Pub. Serv. Inc,, 583 So.2d 829, 832 (La.1991), “In making this determination, the .court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving, party.” Davis v. Wal-Mart Stores, Inc., 00-0445, p. 4 (La. 11 [/]28/00), 774 So.2d 84, 89 (quoting Smith v. Davill Petroleum Company, Inc. d/b/a Piggly Wiggly, 97-1596 (La.App. 1 Cir. 12/9/98), 744 So.2d 23).
Appellate review of .a denial of a motion for new trial is subject to an abuse of discretion standard. Anthony v. Davis Lumber, 629 So.2d 329, 331 (La.1993). The ruling on a motion for new trial requires the appellate court to balance two concepts: the great deference given to the jury in its fact finding role and the great discretion given to the trial court in deciding whether to grant a new trial. Davis, 00-0445, p. 11, 774 So.2d at 93-94. The trial court may evaluate the evidence without favoring either party; may draw its own inferences; and evaluate the credibility of witnesses. Joseph v. Broussard Rice Mill, 00-0628, pp. 14-15 (La. 10/30/00), 772 So.2d 94, 104. However, the “scales are. tilted in favor of the survival of the. jury’s verdict.” Martin v. Heritage Manor South Nursing Home, 00-1023, pp. 6-7 (La. 4/3/01), 784 So.2d 627, 623.
The plaifttiffs argue that the jury failed to award damages for Ms. Plaia’s traumatic brain injury. It is undisputed that a majority of the witnesses presented by the plaintiffs was done so in order to establish a brain injury. In particular, they sought to prove that Ms. Plaia had' suffered a microscopic brain injury, one that was not initially detectable but was Idter seen by a comparison of her MRI studies:
In support of their theory, .the plaintiffs presented the testimony of Drs, Daniel Trahant, John Pasteur Hamide, and Rand Marcel Voorhies.[13] Dr. Trahant stated that, as her treating neurologist, his comparison of the MRI taken in March 2011 with the MRI taken in October 2012 clearly demonstrated that there has been some shrinkage or atrophy of Ms. Plaia’s right temporal lobe. He stated that the damage was not initially observable because the damage done to the brain cells was microscopic, but was now evident when comparing the two MRIs.' "
Dr. Hamide, a diagnostic and interven-tional radiologist, was asked to review the multiple CT scans from the date of the accident (1 July 2010) and 27 July 2010, | ,j¡as well as the two MRIs from March 2011 and October 2012. In his expert opinion, Ms. Plaia sustained a significant blow to the right side of her head resulting in atrophy in an area of the right temporal lobe consistent with a brain injury.
Dr, Voorhies, a neurosurgeon, examined Ms. Plaia and reviewed, the various studies of her brain. He also testified that it was his medical opinion that it was more proba *497 ble than not that Ms. Plaia sustained a traumatic brain injury as a result of the 1 July 2010 accident..
The plaintiffs also presented the testimony of Roberta Anderson Bell, Ph.D., a neuropsychologist, who administered a series of tests to Ms. Plaia on 7 July 2011 and on 26 September 2012. The purpose of these tests was to determine if Ms. Plaia demonstrated any cognitive deficits consistent with an injury to the right temporal lobe. Dr. Bell testified that Ms. Plaia was having problems with attention, concentration, and abstract reasoning skills that were consistent with the right side area of the brain in which she was struck.
On the other hand, the defendants presented expert testimony from Noah Emerson, M.D., a neuroradiologist at Ochsner Foundation Hospital who read the various films, scans, and images taken of Ms. Plaia’s head as part of his position at the hospital. He testified that a comparison of the two MRIs revealed no evidence of a microscopic brain injury.
■ Michael Jared D’Antonio, M.D., a neuro-radiologist with Jefferson Parish Radiology Associates, also testified. He was hired by the defense to review Ms. Plaia’s scans. Based on the scans taken on the date of the accident, Dr. D’Antonio did not see any injury or damage to Ms. Plaia’s brain. He also testified that only a small percentage of patients have damage to the brain that is not visible. He stated | ^that he found no difference between the MRI of March 2011 and the one of October 2012; in other words, he found no atrophy to the right temporal lobe or the frontal lobe of Ms. Plaia’s brain in the October 2012 MRI. As an expert neuroradiologist, Dr. D’Antonio found that the latter MRI was normal. In addition, neuropsychological testing by Kevin Greve, Ph.D., an expert hired by the defense found no cognitive deficits.
We accord great deference to the jury in its decision and to the trial court that declined to grant the motions in substantial part. We do note that the trial court granted the plaintiffs’ motion for additur by awarding Ms. Plaia the sum of $10,000 for permanent scarring to her face. While we find no abuse of discretion by the trial court for the amount awarded, in light of the remand for a new determination of damages, the award for permanent scarring is mooted.
In conclusion, we find that the trial court erred by refusing to -allow Mr. Plaia to testify on his own and. his minor children’s behalf. The trial court also erred by preventing the testimony of other witnesses who could have supported the plaintiffs’ claim, of a traumatic brain injury. Thus, we set aside ..the directed verdicts and the jury’s verdict awarding damages and remand the matter to the trial court for a retrial of the damages allegedly, suffered by Ms. Plaia as a .result of the accident.

FBCNO’S APPEAL IN NO. 14-CA-0746

The issues presented in 2014-CA-0746 concern the various .indemnity provisions in the lease between FCBA and FBCNO, as well as the .Sublease..between SEFH and the FBCNO. These issues were tried by the trial court on 14 April 2014, with a separate judgment rendered on 2 May 2014. In that judgment, the court found in favor of the .FCBA and SEFH,. holding that FBCNO owed full [ ^indemnification to FCBA, as well as full reimbursement of its defense costs, as may be reasonable and appropriate. In addition, because the court held that the Sublease controlled the rights of the parties, SEFH was entitled to reimbursement by FBCNO for all costs paid for its defense, including attorneys’ fees, as may be reasonable and appropriate for its defense.
*498 FBCNO has assigned three errors for review: ■
1. The trial court applied the wrong lease to Ms. Plaia’s accident, erroneously entitling S.E. Funeral Homes, LLC to defense and attorneys’ fees.
2. The trial court erred when it granted full indemnity to landowner defendants [FCBA], because a jury found [FCBA] negligent in the underlying liability case.
3. The trial court erred when it found that the additional insured endorsement to the CMIC 'policy afforded FCBA a defense in this matter.
In its reasons for judgment, the trial court found that the Sublease between SEFH and FBCNO applied to the accident in question. When determining the legal cause of the accident after the jury verdict, the court stated:
First Baptist Foundation, in its opposition to S.E. Funeral Homes’ brief, argues that the point of impact of the accident occurred on property governed by the Cherry Street Lease, which is adjacent to the area covered by the Sublease. This argument ignores the fact that the failure to install a padlock on [the] swinging gate’s tie-post was significant in arguments over the apportionment of liability. Indeed, given the amount of •responsibility the jury apportioned to the other defendants, it is likely that the jury considered it to be the overriding factor in apportioning responsibility. That tie-post is plainly located on property governed by the Sublease.

The Sublease

In 2004, the sublessor, SEFH, a division or subsidiary of Stewart Enterprise's, entered into a Sublease with FBCNO as sublessee and FCBA asj^intervenor. The Sublease commenced at Canal Boulevard and provided vehicular passageway from across the premises leased by SEFH, terminating at FCBÁ’s property at Cherry Street. The Sublease is further subject to a 1992 base lease between FCBA and Greenwood Funeral Home (one of the funeral defendants). The purpose and shared use of the subleased property is defined in a portion of paragraph 2 of the Sublease as follows:
SECOND: PEACEFUL POSSESSION AND USE.
[[Image here]]
At all times pertinent, under the term' of this" lease, Sub-Lessor and Intervenor shall be entitled to the right of joint usage of the leased premises with Sub-Lessee. Intervenor shall retain any and all rights as owner to use or allow the use of the leased premises by it, its assignees and/or invitees for any purpose it deems necessary and proper for the maintenance- and operation of its adjacent properties including but not limited to Greenwood Cemetery and the said use of the sub-leased premises shall not be considered as a violation of Sub-Lessee’s peaceful possession of the leased premises. Sub-Lessee is to use .the premises leased herein as an entrance roadway to Sub-Lessee’s property which, is to presently serve as a church and related facilities. Any use of the leased premises by Sub-Lessee other than as an entrance roadway to Sub-Lessee’s property which is to presently serve as a church and related facilities is strictly prohibited unless agreed to and approved in writing by Intervenor.
Paragraph 8 of the Sublease obligated FBCNO to construct the entrance access *499 roadway pursuant to plans approved by FCBA and SEFH. As noted earlier, the plans and specifications agreed .upon by the parties to the lease for the road and gate were attached to the Sublease.
With regard to the issues of indemnification and defense, paragraphs 11 and 12 of the Sublease between SEFH and FBCNO are relevant and state.in pertinent part:
ELEVENTH: REPAIRS
JjgSub-Lessee shall at all times during the term of this lease, and at its own expense, keep all improvements situated on the premises covered by this lease, in good order, condition and repair, ordinary wear and tear excepted, and shall at all times save and keep Sub-Lessor and/or Interve-nor free and harmless from any and all damage or liability, occasioned by any act or neglect of Sub-Lessee, or any agent or employee of Sub-Lessee, or any tenant or person holding under Sub-Lessee, and shall indemnify and save harmless Sub-Lessor and/or In-tervenor against and from any loss, costs, damage and expenses arising out of or -in connection with the erection of said access roadway upon and/or to said premises, or out of any accident or. injury to any person or damage to property, whomsoever and whatever, due directly or indirectly to the use of the said premises, or any part thereof, by Sub-Lessee, or any other person or persons holding under Sub-Lessee, unless such accident, injury, or damage results from the active negligence or willful act of Sub-Lessor. .[Emphasis suppled.]
TWELFTH: INSURANCE
Lessee assumes complete responsibility for the condition of the premises and Sub-Lessor and Intervenor will not be responsible for any damages suffered in, upon, or pertaining to the Sub-Leased Premises.
Sub-Lessor and/or Intervenor shall not be liable in any .manner for any loss, damage, or injury to the personal property of tenant, its agent or employees, persons invited or permitted by it, to come upon or about the SubLeased Premises, including the sidewalks, the owners of adjacent premises, or any other person, from any cause whatsoever except that caused in whole or in part by the act of Landlord or its agents, contractors or invitees[.] [Emphasis supplied.]
[[Image here]]
According to FBCNO, neither of these paragraphs unequivocally provides for indemnity and defense in this case.

The Cherry Street Lease

In 2004, FCBA, as lessor, entered into a ground lease with FBCNO as lessee. The Cherry Street lease commences at Cherry Street where the Subleased property ends. The lease encompasses the curvature in the roadway where one of Rathe barricade arms swung open across the road on the date of the accident. The lease continues down Cherry Street to the church facilities. Ms. Plaia had left the church facilities and traveled on the access road toward Canal Boulevard. Her vehicle was: on land leased under the Cherry Street lease when she was struck by one of the open-barricade arms.
The purpose of the Cherry Street lease found in paragraph two is quite similar to paragraph two in the Sublease, differing only insofar as SEFH was granted no individual right of joint access, other than that granted by FCBA’ at its discretion.
Paragraphs Ten and Eleven address any assumption of liability by FBCNO: '
*500 TENTH: LESSEE ( TO KEEP LEASEHOLD IMPROVEMENTS REPAIRED.
Lessee shall at all times during the term of this lease, and at its own expense, keep all improvements situated on the premises covered by this lease, in good order, condition and repair, ordinary wear and tear excepted, and shall at all times save and keep Lessor free and harmless from any and all damage or liability, occasioned by any act or neglect of Lessee, or any agent, invitee, guest or employee of Lessee, and shall indemnify and save harmless Lessor against and from any loss, costs, damage and expenses arising out of or in connection with the erection of said access roadway upon and/or to said premises, or out of any accident or injury to any person or damage to property, whomsoever and whatever, due directly or indirectly to the use of the said premises, or any part thereof, by Lessee, Lessee’s invitee, employee or guest, unless such accident, injury, or damage results from the active negligence or willful act of Lessor. [Emphasis supplied.]
ELEVENTH: INSURANCE.
. Lessee assumes complete responsibility for.,the condition of the premise and Lessor, will not be responsible for any damages suffered in, upon, or pertaining to the Leased Premises.
Lessor shall not be liable in any manner for any loss, damage, or injury to the personal property of tenant, its agent or employees, persons invited or permitted by it, | Mto come upon or about the Leased Premises, including the sidewalks, the owners of adjacent premises, or any other person, from any cause whatsoever- except that caused in whole oj? in part by the act of Landlord or its. agents, contractors or invitees; and Lessee agrees to indemnify and save and hold harmless Lessor from any and all liability, damage, cost and expense, to protect Landlord' against any claim, therefor, to defend any such claim that may be made or any suit that may be brought against Lessor, occurring on or respiting’from the Leased Premises - and to pay all costs and .expenses of said protection and defense. [Emphasis supplied.]

Discussion of, Assignment of Error No. 1

-FBCNO first argues that the trial court erred by applying the Sublease and not the Cherry Street lease, which entitled SEFH to an award of defense..costs and attorneys’ fees. For the reasons that follow, we find that the trial court was manifestly erroneous in finding that the Sublease defined the nature of the relationship between the. parties.
In finding that the Sublease controlled, the trial court stated: ■
This argument ignores the fact that the failure- to install a'padlock on [the] swinging gate’s tie-post was significant in arguments over the apportionment of liability. Indeed, given the amount of responsibility the jury apportioned to the other defendants, it is likely that the jury considered it to be the overriding factor in' apportioning responsibility. That tie-post is plainly located on property governed by the Sublease.
This reasoning completely ignores the actual testimony elicited at trial: that the gates were installed at the insistence of FCBA to protect its property. FCBA assumed the custody and control over the gate and the.manner in which it was secured to the tie post. That is to say,. FCBA *501 had garde.[14] The .gate that struck Ms. Plaia’s vehicle was installed - on property-covered by the Cherry, Street lease; the | ¡¡naccident occurred on, that same property. In addition, the evidence fails to demonstrate that the gate was designed improperly, was built in a defective manner, or did not operate as intended. The omission of a padlock and the ease with which the gate could be unlatched by anyone created a dangerous condition and an unreasonable risk of harm that led to this unfortunate accident. The problem was not the tie post itself—it was that the gate could swing freely into the roadway if not properly anchored. Both gates and the other tie post were all installed on property covered by the Cherry Street lease. That the tie post in question was installed on property covered by the Sublease is immaterial in deciding which lease is applicable to this set of facts. Therefore, we find that the Cherry Street lease governs the rights among the parties.
By so holding, we reverse and set aside that part of the 2 May 2014 that awarded costs and attorneys’ fees to SEFH, as it was not a party to the Cherry Street lease.
Discussion of Assignment of Error No.. Two
FBCNO next argues that the trial court erred by granting full indemnity to FCBA because the jury assigned a percentage of fault to FCBA. For the reasons that follow, we agree in part and amend that portion of the judgment.
With respect to the Cherry Street lease, and the issue of indemnity, the following provision of the lease is pertinent;
TENTH: LÉSSEE TO KEEP LEASEHOLD IMPROVEMENTS REPAIRED.
Lessee shall at all times during the term .of, this lease, and at its own expense, keep all improvements situated on the premises covered by this lease, in good order, condition and repair, ordinary wear and tear excepted, and shall at all times save and keep Lessor free and harmless from any and all damage or liability, occasioned by any act or neglect of Lessee, or any | si agent, invitee, guest or employee of Lessee, and shall indemnify -and save harmless Lessor against and from any loss, costs, damage and expenses arising out of or in connection with the erection of said access roadway upon and/or to said premises, or out of any accident or injury to any person or damage to property, whomsoever and whatever, due directly or indirectly to the use of the said premises, or any part thereof, by Lessee, Lessee’s invitee, employee or guest, unless such accident, injury, or damage results from the active negligence or willful act of Lessor. [Emphasis supplied.]
Paragraph eleven of the Cherry Street lease provides as follows:
ELEVENTH: INSURANCE.
Lessee assumes complete responsibility for the condition of the premise and Lessor will not be responsible for any damages suffered in, upon, or pertaining to the Leased Premises. Lessor shall not be liable in any manner for any loss, damage, or injury to the personal property of tenant, its agent or employees, persons invited or permitted by it, to come upon or about the Leased Premises, including the sidewalks, the owners of adjacent premises, or any other person, from *502 any cause whatsoever except that caused in whole or in part by the act of Landlord or its agents, contractors or invitees; and Lessee agrees to indemnify and save and hold harmless Lessor from any and all liability, damage, cost and expense, to protect Landlord against any claim, therefor, to defend any such claim that may be made or any suit that may be brought against Lessor, occurring on or resulting from the Leased Premises and to pay all costs and expenses of said protection and defense. [Emphasis supplied.]
In Meloy v. Conoco, Inc., 504 So.2d 833 (La.1987), the Louisiana Supreme Court stated as follows regarding the distinction between an indemnity agreement and an insurance policy:
An indemnity agreement is a specialized form of contract which is distinguishable from a liability insurance policy. A cause of action under a liability insurance policy accrues when the liability attaches. However, an insurer’s duty to defend arises whenever the pleadings against the insured disclose a possibility of liability under the policy. On the other hand, an indemnity agreement does not render the in-demnitor | pliable until the indemnitee actually makes payment or sustains loss. Therefore, a cause of action for indemnification for cost of defense does not arise until the lawsuit is concluded and defense costs are paid, 504 So.2d at 839 [emphasis added]; [citations and footnotes omitted].
This court has also held that a cause of action for indemnification for the cost of defense does not arise until the lawsuit is concluded, and the costs of the defense are paid. In Webb v. Shell Offshore Inc., 557 So.2d 276 (La.App. 4th Cir.1990), this court, citing the Meloy case, stated that “a cause of action for indemnification for cost of defense does not arise until the lawsuit is concluded and defense costs are paid.” 557 So.2d at 278, We further stated that “Shell must assert its action for defense costs after the termination of the instant suit and may only recover if it is free of negligence or fault.” Id.
In the instant case, FCBA’s claims for indemnity and defense costs were tried on 14 April 2014. The trial court rendered judgment on 2 May 2014. The trial court’s reasons for judgment have no relevance herein as it determined the rights and obligations of the parties based on the Sublease, which we have held was error.
In Scarberry v. Entergy Corp., 13-0214, pp. 44-45 (La.App. 4 Cir. 2/19/14), 136 So.3d 194, 220-21, we stated:
Here, we discuss briefly the law regarding indemnity or hold harmless agreements. Indemnity in its most basic sense means reimbursement and may lie when one party discharges a liability which another rightfully should have assumed. See Nassif v. Sunrise Homes, Inc., 98-3193, p. 2 (La. 6/29/99), 739 So.2d 183, 185. It is based on the principle that everyone is responsible for his own wrongdoing, and if another person has been compelled to pay a judgment which ought to have been paid by the wrongdoer, then the loss should be shifted to the party whose negligence or tortious act caused the loss. Id. The obligation to indemnify may be express, as |33in a contractual provision, or may be implied in law, even in the absence of an indemnity agreement. Id.
As noted by Professor Litvinoff: “An indemnity, or hold harmless, agreement is a contract whereby a party, called the indemnitor, agrees to protect another, called the indemnitee, against damages incurred by the lat *503 ter as a result of his breach of a duty owed to a third party.” 6 La. Civ. L. Treatise, Law of Obligations § 11.27 (2nd ed.). Thus, the parties to a contract containing an indemnification provision may adjust or allocate the risk of loss or damage that may. arise in the performance of their respective obligations. This issue of whether an indemnitee may be indemnified against its own negligent acts was addressed over forty years ago in Arnold v. Stupp Corp., 205 So.2d 797 [,799] (La.App. 1st Cir.1967). In that case, the court of appeal surveyed the case law and noted:
The general rule is stated thus: “A contract .of indemnity will not be construed to indemnify the indemnitee against losses resulting to him through his own negligent acts, where such intention is not expressed in unequivocal terms. 27 Am.Jr., Indemnity, § 15, page 464; 42 C.J.S. Indemnity § 12, page 580.” The established principle supporting the rule is that general words alone, i.e., “any and all liability”, do not necessarily import an intent to impose an obligation so extraordinary and harsh as to render an indemnitor liable to an indemnitee for damages occasioned by the sole negligence of the latter.
Subsequently, in Perkins r Rubicon, Inc., 563 So.2d 258,259 (La.1990), the Louisiana Supreme Court held that an indemnity contract will not be construed to- indemnify an indemnitee against losses resulting to him through his own negligent acts' unless such an intention is expressed' in unequivocal terms. Therefore, in order to find that an indemnity contract indemnifies the indemnitee against the consequences of his own negligence, it must be shown that the contract expresses such language in clear, unequivocal terms. See Roundtree v. New Orleans Aviation Board, 02-1757, p. 8 (La.App. 4 Cir. 4/9/03), 844 So.2d 1091, 1096.
la/fhe Cherry Street lease specifically precludes indemnity to FCBA for its own negligence. The jury assessed 42.5% of the fault for the accident to FCBA; it is entitled to indemnity for the 57.5% it was not at fault. Therefore, the award by the trial court to FCBA for indemnity is amended accordingly..

Discussion of Assignment of Error No. S

The final assignment of error raised by FBCNO in Nol 2014-CA-0746 concerns the ruling of the trial court holding that the additional insured endorsement in the CMIC policy afforded FCBA to a defense.
The interpretation of an additional-insured endorsement is a question of law, which requires an examination of the language of the particular endorsement to determine its meaning. Jones v. Capitol Enterprises, Inc., 11-0956, p. 13 (La.App. 4 Cir. 5/9/12), 89 So.3d 474, 484 (citing Miller v. Superior Shipyard and Fabrication, Inc., 01-2907, p. 5 (La.App. 1 Cir. 8/20/03), 859 So.2d 159, 163). In Jones, we further stated:.
'Questions of law áre reviewed de novo “without deference to the legal conclusions of the courts below;” Durio v. Horace Mann Ins. Co., 11-0084, p. 14 (La. 10/25/11), 74 So.3d 1159, 1168. As to questions of law,' “the standard of review of an appellate court is simply whether the court’s interpretive decision is legally correct.” Ohm Lounge, L.L.C. v. Royal St. Charles Hotel, L.L.C., 10-1303, p. 4 (La.App. 4 Cir. 9/21/11), 75 So.3d 471, 474 (citing Glass v. Alton Ochsner Medical Foundation, 02-0412, p. 3 (La.App. 4 Cir. 11/6/02), 832 So.2d *504 403, 405). “[I]f the decision of the trial court is based upon an erroneous application of law rather than on a valid exercise of discretion; the decision is .not entitled to deference by the reviewing court.” Id, (citing Pelleteri v. Caspian Group Inc., 02-2141, pp. 6-7 (La.App. 4 Cir. 7/2/03), 851 So.2d 1230, 1234-35).
Id., 11-0956 at p. 11, 89 So.3d at 483-84.
In Mossy Motors, Inc. v. Cameras Am., 04-0726, pp. 5-7 (La.App. 4 Cir. 3/2/05), 898 So.2d 602, 606-07, we stated:
Louisiana has a long history of cases, which assert an insurer’s duty to defend its insured. Generally the insurer’s obligation to defend suits against its insured is broader than its liability for damage claims. American Home Assur. Co. v. Czarniecki, 255 La. 251, 230 So.2d 253 (La.1969). The insurer’s duty to defend suits is determined by the allegations of the petition, with the insurer being obligated to furnish a defense unless the petition unambiguously excludes coverage. Id. The allegations of'the petition should be liberally construed in determining whether . they set forth grounds which bring the claims within the scope of the insurer’s- duty to defend the suit against its insured. Id. The duty to defend is not dependent upon the outcome of the suit. Id. Also See Rando v. Top Notch Properties, L.L.C., 2003-1800, (La.App. 4 Cir. 6/2/04) 879 So.2d 821.
A liability insurer’s duty to defend and the scope of its coverage are separate and distinct issues. Dennis v. Finish Line, Inc., 93-0638 (La.App. 1 Cir. 3/11/94), 636 So.2d 944, 946. It is .likewise well-recognized that the obligation of a liability insurer to defend suits against its, insured is. generally broader than its obligation to provide coverage for damages claims. Steptore v. Masco Construction Co., Inc,, 93-2064, p. 8 (La. 8/18/94), 643 So.2d 1213, 1218. The issue of whether a liability insurer has the duty to defend a civil action against its insured is determined by application of the “eight-corners rule,” under which an insurer must look to the “four corners” of the plaintiffs petition and the “four corners” of its policy to determine whether it owes that duty. Vaughn v. Franklin, 00-0291, p. 5 (La.App. 1 Cir. 3/28/01), 785 So.2d 79, 84. Under this analysis, the factual allegations of the plaintiffs petition must be liberally interpreted to determine whether they set forth grounds which raise even the possibility of liability under the policy. Id. In other words, the test is not whether the allegations unambiguously assert coverage, but rather whether they do not unambiguously exclude coverage. Id. Similarly, even though a plaintiffs petition may allege numerous claims for which coverage is excluded under an insurer’s policy, a duty to defend may nonetheless exist , if there is at least a single allegation in the petition under which coverage is not unambiguously excluded. Employees Ins. Representatives, Inc. v. Employers Reinsurance Corp., 94-0676, p. 3 (La.App. 1 Cir. 3/3/95), 653 So.2d 27, 29.
I ar,Reviewing the original and supplemental and amending petitions filed by the plaintiffs, numerous allegations of negligence are asserted against FCBA, as well as the other defendants. While none of the allegations are specific where either FCBA or FBCNO is concerned, a liberal interpretation demonstrates that they .set forth grounds, which raise the possibility uf liability on the.part of FCBA. Based on the *505 four corners of the petitions, FBCNO had a duty to defend FCBA.
We turn to the insurance policy at issue.
Pursuant to the Cherry Street lease, FBCNO was required to obtain a commercial liability policy and name FCBA as an additional insured under that policy. Paragraph Eleven in the insurance provisions of the Cherry Street lease in provides:
At all times during the terms of this Lease or any renewal thereof, and as part of the consideration . of this Lease, Tenent [FBCNO] shall provide and maintain, at Tenant’s expense, the following insurance naming Landlord [FCBA] ... ras an additional insured:
a) Commercial General Public Policy Liability Insurance, in an amount applicable to bodily injury and property damage of not less than $5,000,000.00 combined single limit per occurrence in or on the Leased Premises-with endorsements covering automobile liability,-employee liability and contractual liability for the indemnification of Landlord under this lease. [Emphasis supplied.]
FBCNO argues that a simple reading of these provisions indicate that the Cherry Street lease provides indemnification only and not a duty to’defend as claimed by FCBA and awarded by the trial court.
|S7The declarations page contained in the insurance policy issued by CMIC to FBCNO lists FCBA as an additional insured. This is defined as:
A. ADDITIONAL INSURED—DESIGNATED PERSON OR ORGANIZATION
1. Paragraph C, Who Is An Insured, is. amended to include as an insured the person or organization . shown in the applicable schedule, in the Declarations page but only with respect to “bodily injury,” “property damage,” “personal injury,” or “advertising injury” liability arising out of your [FBCNO] operations or premises owned or rented by you. [FBCNO]. ; [Emphasis supplied,]
FBCNO argues that the accident .did not arise out of its operations as a daycare facility. Thus, no duty to defend arose from the Cherry Street lease and the insurance policy.
Contrariwise, FCBA maintains that the claims in this case plainly arise out of the operations of FBCNO; it operated the daycare center which Ms. Plaia was patronizing at the time of her accident. In fact, FCBA points out that the road upon which Ms. Plaia was driving on the day in question was used by all parents of children utilizing the church-run daycare.
Bonin v. Westport Ins. Corp., 05-0886, pp. 4-6 (La. 5/17/06), 930 So.2d 906, 910, the Court outlined the elementary principles for construing insurance policies, stating:
An insurance policy is a- contract between the parties and should- be construed using the general rules of interpretation of contracts set forth in the Civil Code. The judicial responsibility. in interpreting insurance contracts is to determine the parties’ common intent. Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning.
An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict .its provisions beyond, what is reasonably | ^contemplated by its terms or so as to achieve .an absurd conclusion. Unless & ■. policy conflicts *506 with statutory provisions or public policy, it may limit an insurer’s liability and impose and enforce reasonable conditions upon the policy obligations the insurer contractually assumes.
If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the insurer and in favor of coverage. Under this rule of strict construction, equivocal provisions seeking to narrow an insurer’s obligation are strictly construed against the insurer. [Internal citations omitted.]
The question then is whether this accident arose out of FBCNO’s “operations or premises owned or rented by it.” We find that it did.
Holzenthal v. Sewerage & Water Board of New Orleans, 06-0796 (La.App. 4 Cir. 1/10/07), 960 So.2d 66, involved three groups of homeowners who claimed that their homes were damaged during the course of construction of the Southeast Louisiana Urban Drainage Project. The Sewerage & Water Board (“SWB”) contended that part of the negligence was born by its engineering consultant, Brown, Cunningham and Ganuch, Inc. (“Brown”), which was insured by Fidelity & Guaranty Insurance Company (“Fidelity”). We agreed with the trial court’s finding that consulting services fell under the “professional services” exclusion, thus no coverage existed under Fidelity’s policy.
The SWB also argued that, as an additional insured under the policy, Fidelity had a duty to defend the SWB for liability arising out of Brown’s operations. We stated:
In order to determine whether an insurer owes a duty to defend a party, the court’s analysis must be based upon the factual allegations contained within the four corners of the plaintiff’s petition and the terms contained within the four corners of the insurance policy. The Fidelity policy provides in pertinent part:
LflWHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule [the SWB] as an insured but only with respect to liability arising out of your [Brown’s] operations or premises owned by or rendered to you [Brown].
An insurer must provide a defense to an insured if, assuming all of the allegations of the petition to be true, there would be both coverage under the policy and liability to the plaintiff. American Home Assur. Company v. Czarniecki, 255 La. 261, 230 So.2d 253 (La.1969). Fidelity’s policy provides that SWB would be an additional insured, but only with respect to liability arising out of Brown’s operations. The plaintiffs’ petitions are devoid of any allegations sufficient to inform Fidelity of the possibility that SWB could incur any liability to the plaintiffs arising out of Brown’s operations. There is no allegation that SWB’s liability to the plaintiffs comes through Brown, and no allegation that Brown was in any way negligent or failed to comply with its contractual obligations or the plans and specifications for the Project as they related to Brown. Absent such allegations, Fidelity has no obligation to defend SWB. None of the plaintiffs alleged any damages arising out of Brown’s operations or premises owned by or rendered to Brown. Therefore, there can be no coverage for SWB as an additional insured under the policy.
Id., 06-0796 at pp. 49-50, 950 So.2d at 84.
In the petitions herein, the plaintiffs allege that sole and proximate cause of Ms. *507 Plaia’s injuries resulted from the negligence of all the defendants, including FBCNO. The following non-exclusive particulars listed were as follows:
a. Failing to provide proper maintenance to keep their premises in a safe and orderly condition;
b. Failing to take necessary measures to' protect the safety of persons on their premises;
c. Failing to properly train and/or supervise their employees as to methods of maintenance, repair, inspection and warnings to insure the safety of persons on the premises;
d. Failure to remedy an unsafe and/or hazardous condition on the premises;
e. Failure to take reasonable steps to avoid this accident;
|4nf. Failing to timely and/or properly prepare the premises so as to avoid unreasonably dangerous conditions on the premises;
g. Creating an unreasonably dangerous condition on the premises;
h. Failing to prevent unreasonable conditions from existing; [and]
i. Any and all other acts of negligence which may be proven at the trial of this matter.
None of these allegations specifically refer to FBCNO and/or the operations of its day care center.
The only expert testimony at trial concerning causation was from Neil Bradley Hall; he testified that nothing was wrong with the gate or the maintenance of the gate, responsibilities of FBCNO under the Cherry Street lease.[15] And because we found that FBCNO had partial custody and control (garde) of the gate and the means by which the gate was tethered to the tie post, some'of these allegations can be perceived as “arising out of’ FBCNO’s operations.
In Batiste v. City of New Orleans, 11-1168 (La.App. 4 Cir. 2/29/12), 85 So.3d 800, the decedent sustained a severe ankle injury necessitating surgery while attending a high school graduation ceremony sponsored by the Orleans Parish School Board (“OPSB1’) held at the Mahalia Jackson Theater of Performing Arts (“theater”) when she descended a stairwell located in the balcony area. While recovering from her surgery, the decedent developed a pulmonary embolism resulting in her death.
Prior to the accident, the City of New Orleans (“City”), owner of the theater, entered into a management agreement with SMG Crystal, LLC (“SMG”) for the management and operation of the theater. The agreement required SMG to obtain a commercial general liability (“CGL”) policy of insurance, naming the City as an 141 additional insured. This policy was provided by United States Fidelity & Guaranty Company (“USF & G”).
At issue .in the appeal was the trial court’s .ruling that the USF & G policy provided coverage to the City as an additional insured if found hable for the. injuries sustained by the decedent. The policy issued to SMG stated that USF & G would “pay those sums that the insured becomes legally obligated to pay as damages because of „bodily injury’ or «property damage’ to which the insurance applies.” Id., 11-1168 at p. 4, 85 So.3d at 803. The policy further defined an insured to “include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of your operations with respect to your use of that part of the premises leased to you or which you have otherwise been permitted to use *508 and shown in the- Schedule and subject to the following additional exclusions,” Id., 11-1168 at p. 5, 85 So.3d at 803 [emphasis supplied],
. SMG and USF & G argued that the City’s additional insured status existed only with respect to liabilities- arising out of. SMG’s operations; Because the accident was purportedly caused by an alleged structural defect in the configuration of the stairwell at issue, coupled with poor lighting in the .area, these alleged liabilities did not arise out of SMG’s operations of the theater. Consequently, USF & G argued that its policy did not afford coverage to the City under the facts and circumstances presented by this case. We disagreed, stating:
Accordingly, we find that the decedent’s use of the steps upon which she fell sustaining injury was incidental to the graduation event, since the graduation could not have effectively taken place without providing ingress and egress to its attendees. The graduation event is what brought the decedent to the Theater and required her to use the steps upon which she fell in order to reach her |42seat in the balcony area. See Haylock v. Jerusalem Temple Ancient Arabbie Order of Noble of Mystic Shrine, 578 So.2d 999, 1001-1002 (La.App. 4th Cir.1991); Baker v. Sears, Roebuck & Co., 32,651, 32,767, pp. 5-7 (La.App. 2 Cir. 3/3/00), 753 So.2d 1011, 1014-1015. As SMG’s lease of the Theater to OPSB for the graduation arose out of SMG’s business operations, and the decedent’s .use of and subsequent fall on the steps, which occurred on a part of the premises that SMG was. permitted to use, was incidental to the graduation, we conclude that the liability of the City, if any, for the decedent’s injuries arose out of SMG’s business operations, thereby triggering coverage under USF & G’s policy to the City as an additional insured.
Id., 11-1168 at p. 6, 85 So.3d at 804.
■The same reasoning applies here. Ms. Plaia was on property covered by the Cherry Street lease because of the daycare center run by FBCNO. In other words, but for the daycare center, Ms.. Plaia would not have been on that access road when the gate struck her. Thus, her injuries arose out of FBCNO’s. business operations,’ thereby triggering a duty to defend FCBA under the CMIC policy as an additional insured.
Therefore, we affirm that part, of the judgment in No. 2014-CA-0746 that held that FBCNO and its insurer, CMIC owed a duty to defend FCBA.[16]

Award of Attorneys’ Fees

Finally, FBCNO argues that the trial court erred by awarding.attorneys’ fees to FCBA relying on the Sublease. Ip particular, the trial court stated .in its written réasons for judgment that from the mention of “defense” in Paragraph 12 of the _JágSublease was sufficient to “imply by inference” that SEFH was entitled to be reimbursed for its-attorneys’ fees. Because we have determined that the Sublease has no bearing on this issue, we again look to *509 paragraph eleven the Cherry Street lease, quoted in full on pages 499-501, supra.
FBCNO contends that because the Cherry Street lease does not specifically provide for an award of attorneys’ fees, none may be awarded. Obviously, FCBA argues to the contrary.
We have already determined that FCBA is entitled to indemnity in the amount of 57.5% of the award and that FBCNO and CMIC owed it a defense as an additional insured under the CMIC policy; in that respect, the judgment of the. trial court is affirmed.[17]
Neither the insurance policy nor the lease in question mentioned attorneys’ fees. Both or either could have easily done so. For example, in Smith v. Noel, 12-1216, unpub. (La.App. 1 Cir. 4/23/13), 2013 WL 1740315, the subcontract at issue stated that subcontractor, Outdoor Living, “agreed to ¡defend, indemnify, and hold harmless Woodward and Sunrise „from and against any claim, cost, expense or liability (including.attorneys’ fees), attributable to bodily injury .., arising out of, resulting from or occurring in connection with the performance of the Work’ by Outdoor Living.” [Emphasis in original.] Id., 2013 WL 1740315 at p. 5.
As with an insurance policy, interpretation of a contract is a question of law and subject to de novo review. Berthelot v. Le Investment, L.L.C., 02-2054, p. 3 (La.App. 4 Cir. 1/21/04), 866 So.2d 877, 880. The general rule in Louisiana is 144that attorney’s fees are not allowed unless provided for by statute or contract. Dixie Services, L.L.C. v. R & B Falcon Drilling USA, Inc., 05-1212, 06-1209, p. 8 (La.App. 4 Cir. 3/21/07), 955 So.2d 214, 220.
In Kinsinger v. Taco Tico, Inc., 03-0622, pp. 4-6 (La.App. 5 Cir. 11/12/03), 861 So.2d 669, 671-72, our brethren, on the. Fifth Circuit Court of Appeal summarized the existing jurisprudence, on this issue:
On appeal, Kelly Bean argues McGreevey’s is not entitled to -recover attorney’s fees and costs because there is no express mention of duty to defend or duty to pay expenses in the contract of indemnity. McGreevey’s contends the attorney’s fees and costs were incurred as a result of having to defend the main demand and as such are covered by the indemnity agreement.
A number of cases are discussed in both parties’ briefs, but none are directly controlling. In Faucheaux v. Prytania Medical Complex Owners Association, 93-2042 (La.App. 4 Cir. 8/17/94), 642 So.2d 242, the Fourth Circuit found there was no duty on the part of the lessee to defend the lessor in a suit for injuries sustained by a patron. Although the lease agreement required the lessee to “indemnify and save harmless Lessor against and from any loss, costs, damages and expenses arising ... out of any accident to or injury to any person or property whomsoever,” the ■ court found that lessee had no duty to defend because there was no mention of assuming lessor’s defense in the applicable portion of the indemnity agreement. Id. at'244.
In Richey v. Moore, [36,785 (La. App. 2 Cir. 3/7/03), 840 So.2d 1265] supra the assignors of a léase sought a declaratory judgment seeking attorney fees under the indemnity provision of the lease. The lower court *510 awarded attorney fees based upon an indemnity and hold harmless agreement. That agreement provided:
Assignee hereby assumes all the obligations and responsibilities of Assignors under the terms of said leases and under the rules, regulation or laws of any government or regulatory agency having jurisdiction and agrees to protect, indemnify and hold Assignors, their agents, employees, heirs and assigns harmless from any and all losses, liabilities, fines, penalties, claims, costs and expenses imposed upon them with | ^respect to the property herein conveyed whether such arose heretofore or whether such arise hereafter.
In reversing the award of attorney’s fees the appellate court noted that prior decisions only allowed recovery of attorney’s fees where the indemnity agreement expressly provided a duty to defend. However, the case is not dispositive of the issue because the Second Circuit found the trial court erred in awarding attorney fees because the suit was for a declaratory judgment seeking interpretation of a lease contract and not contractual indemnification for costs incurred in defending a claim. The court specifically stated that they made no ruling as to the outcome, had this been a suit for indemnity rather than a suit for declaratory judgment, to enforce the terms of a lease agreement.
In Richey v. Moore, supra several Second Circuit decisions are discussed that deal with the issue of obligation to pay for the costs of defense based on contractual language. In Curtis v. Curtis, 28,698 (La.App. 2 Cir. 9/25/96), 680 So.2d 1327, the trial court awarded attorney fees and the Second Circuit affirmed the award of attorney fees based on indemnification language contained in a community partition agreement. The language included an obligation to pay, “any loss ... sustained by virtue of ... failing to pay debts assumed.” Id. p. 1332. The plaintiff in that case was awarded attorney fees because the defendant, her ex-husband, failed to pay tax obligations, which the trial court found he was obligated to pay pursuant to the partition agreement. The trial court found that the wife’s attorney fees, which were incurred to enforce the obligation to pay the debt, were recoverable pursuant to the partition agreement language.
The Second Circuit in Curtis relied on South Central Bell Telephone Co. v. Gaines Petroleum Co., Inc., 499 So.2d 521 (La.App. 2d Cir.1986) for the proposition that a hold harmless or indemnity provision can include an obligation for reasonable attorney fees, “even though the obligatory provision does not specifically authorize attorney fees.” Curtis, supra, at p. 1332.
We agree that an indemnification agreement may impose the obligation to pay reasonable attorney fees in some instances when the obligation to pay attorney fees is not' specifically identified in the indemnification agreement, but is implied by inference. However, we hold that in order for the indemnitor to be liable for attorney fees the indemnification language must be Insufficient to infer the obligation. In South Central Bell, supra at 525, the indemnification language obligated the defendant to “hold harmless and defend.” In Curtis, supra, defendant was obligated to pay for any loss due to his failure to pay debts assumed. The language of both indemnification agreements, in
*511 which attorney’s fees were awarded, required an obligation beyond the obligation to pay “claims or damages”, which is the operative language in the Kelly Bean indemnification agreement.
We agree with the Fifth Circuit that an indemnification agreement may impose the obligation to pay reasonable attorneys’ fees in instances where the obligation to pay attorneys’ fees is not specifically identified in the indemnification agreement, but is implied by inference. In this case, the indemnification language includes the language:
to defend any such claim that may be made or any suit that may be brought against Lessor, occurring on or resulting from the Leased Premises and to pay all costs and expenses of said protection and defense. [Emphasis supplied.]
We find, that based on the case law, FBCNO is obligated to pay all attorneys’ fees incurred by FCBA in defending the underlying lawsuit. However, we hold that FCBA cannot recover the attorneys’ fees incurred in pursuing its claim for indemnity or for establishing that CMIC had a duty to defend it.[18]

Discussion of Issues Raised by the Court

None of the defendants contested the jury’s apportionment of fault as an error. The jury assigned 15% to Stewart and 42.5% each to FCBA and FBCNO. We ordered that the parties submit supplemental briefs on the two following questions of law:
| ⅜7(1) In the context of La. C.C.P. art. 2128 (“[a]n assignment of error is not necessary in any appeal.”) and Merrill v. Greyhound Lines, Inc., 10-2827, p. 2 (La. 4/29/11), 60 So.3d 600, 602 (“[W]e have held that an appellate court has the authority to consider an issue even when there is no assignment of error.”), when the parties are disputing contractual indemnity provisions, based in part on assignments of fault as allocated by the trier of fact, does the court of appeal have the authority to reapportion those assignments of fault if it finds either (a) no evidence or (b) insufficient evidence to support the trier of fact’s apportionment of fault?
(2) If the record on appeal supports a finding that only one party may be at fault, but two or more parties cannot as a matter of fact be comparatively at fault, may the court of appeal allocate all fault to one party on de novo review or must the court of appeal remand for a new trial on the issue of fault.
The law clearly permits this court to address any issue it finds in the appeal. See La. C.C.P. art. 2128 (“[a]n assignment of error is not necessary in any appeal.”) and Merrill v. Greyhound Lines, Inc., 10-2827, p. 2 (La. 4/29/11), 60 So.3d 600, 602 (“[W]e have held that an appellate court has the authority to consider an issue even when there is no assignment of error.”) Therefore, while none of the parties raised the allocation of fault as an assignment of error, we have the authority to consider it.
The manifest error standard governs this court’s review of the trial court’s or jury’s findings regarding the allocation of fault. Beggs v. Harrah’s New *512 Orleans Casino, 14-0725, pp. 13-14 (La. App. 4 Cir. 1/21/15), 158 So.3d 017, 925. The jurisprudence is well-settled .that appellate courts are required to giv:e great |4Sdeference to the trier of fact’s allocation of fault and that “[o]nly after making a determination that the trier of fact’s apportionment of fault is clearly wrong can an appellate court disturb the award.” Fontenot v. Patterson Ins., 09-0669, p. 22 (La. 10/20/09), 23 So.3d 259, 274 (citing Clement v. Frey, 95-1119, 95-1163, p. 7 (La. 1/16/96), 666 So.2d 607, 610-11). The Supreme Court has analogized an appellate court’s allocation of fault after a finding of manifest error to an appellate review of quantum assessments. Clement, supra.
In Duncan v. Kansas City Southern Railway Co., 00-0066, pp. 10-11 (La. 10/30/00), 773 So.2d 670, 680-81 the Supreme Court summarized the standard of review applicable to allocation of fault determinations as follows:
This Court has previously addressed the allocation of fault and the standard of review to be applied by appellate courts reviewing such determinations. Finding the same considerations applicable to the fault allocation process as are applied in quantum assessments, wé concluded “the trier of fact is Owed some deference in allocating fault” since the finding of percentages of fault is also a factual determination. Clement v. Frey, 95-1119 (La. 1/16/96), 666 So.2d 607, 609, 610. As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault. Id. Therefore, an appellate court should only disturb the trier of fact’s allocation of fault when it is clearly wrong or manifestly erroneous.- Only after making a .determination that the trier of fact’s apportionment of fault is clearly wrong can an appellate court disturb the award, and then .only to the extent of lowering it or raising it to the highest or lowest point respectively which is reasonably within the trial court’s discretion. Clement, 666 So.2d at 611; Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La. 1977).
Mr. Hall was called by the plaintiffs and testified about the condition of the gates and tie posts. He was tendered and accepted as an expert in architecture and I ^engineering, including road design and traffic safety.[19] Mr. Hall was retained to write a report concerning a safety evaluation of the physical layout of the gates and tie posts. He was the only witness who testified at trial concerning the design and condition of the gate and the tie post from which the gate was unlatched.
Mr. Hall testified that there were two primary causes of the accident. First was the presence of an untethered 20-plus foot long metal gate in the roadway; second was that had. the gate remained tethered to the tie post, the gate would not have been moving freely inside the roadway. Mr. Hall confirmed that the architect’s tie post plans called for a padlock. He agreed that the architect’s plans should have been followed. In his expert opinion, an adequate solution to the problem of the gates blowing open would have been to use not only a latch but also a padlock as backup security.
Under cross examination, Mr. Hall stated that it was possible for the gate to be unlatched by someone bumping into it but *513 that it would be unusual. He was also questioned extensively about whether vibrations of a lawn mower or large crane could have unlatched the gate. While Mr. Hall testified that either was a possibility, he had not considered or tested for that but would have low confidence in vibrations being what unlatched the gate in question. He agreed that the decision not to follow the architect’s plans and not install the padlock contributed to the unsafe condition existing at the time of the accident.
Rosalind Gibson, employed by FCBA, was also called as a witness by the plaintiffs. She worked in the mausoleum and had been employed by FCBA for almost 13 years at the time of trial. Ms. Gibson stated that she was the “flow,,,care | ^specialist.” When she arrives to work at approximately 7:25 a.m., she sweeps the mausoleum and, 20 minutes later, she goes outside to smoke a cigarette; she does this every day.
Prior to the date of the accident, Ms. Gibson had seen the landscapers unlatch the gate in question to mow under the pole. On 1 July 2010, the date of the accident, while she was outside smoking her cigarette, she observed a crew of landscapers cutting the grass in the area around the gate in question; they were present every Thursday beginning at approximately 8:00 a.m., She testified that she personally witnessed one of the landscapers open the gate to mow under it; this was the gate that struck Ms. Plaia’s vehicle. She stated that nothing existed to block her view.
Under cross examination, she admitted that she had never seen the gate out in the road and that she did not know which of the landscapers she saw unlatch the gate on the morning of the accident. She further stated that it was an employee of FCBA, Mr. Gately, who opened and closed the gates every day, but she did not know if anyone from FCBA was assigned to make sure that the gates remain secured and out of the street during the day.
‘Further under cross examination, Ms. Gibson testified that she had never seen the landscapers use a weed eater to cut the grass under the opened-gate; they only used the weed eater -in the flower beds. She stated that for the past 13 years her. smoke 'break coincided with the landscapers unlatching the gate but that the break ended before she could see what they' do with the gate after mowing the area. --
Under re-direct, Ms. Gibson confirmed that on the morning of. the accident, she saw one of the landscapers unlatch the gate: “There is a hook that was on that 1 sígate; that you have to unhook. That’s .what I remember, them unhooking.a hook to go under the gate.”
Ms. Gibson’s testimony was confirmed by Theresa M. Hyde, who was the sexton for FCBA for 25 years: She stated that the grass cutters from Stewart Enterprises would cut the grass in the area of the open gate. When the gates were open during cemetery hours, they would have to unlatch it to use the lawn mowers and weed eaters, although she never saw that happen. That was because thick bushes prevented access to that area from the other direction. She further testified a bungee cord and dog leash were both used to keep the gate open; she never ,saw any snap shackles used to keep the . gates open. Ms. Hyde stated that as sexton, she had the responsibility of opening all the gates in the morning and closing them at night.
Under additional questioning, Ms. Hyde testified that no one with FCBA had anything to do'with the installation of the tie posts. She knew this .because she would have been the one.to meet with thereon- *514 tractors and explain what needed to be done. When these gates were closed at night, a combination padlock was used to secure the gates. She ■ did not know of anyone other than FCBA employees having the combination.
As briefly stated supra, Mr. Gately, FCBA’s sexton at the time of the accident, stated that both , bungee cords and dog leashes had been used to secure the gate to the tie post over the years. He testified that he himself put a latch on the gate so it could be secured to the tie post. He stated that he was never told that a padlock should be used during the day to keep the gates secured.
On the morning of the accident, Mr. Gately opened the gate in question and securely latched it to the tie post; he pulled on it to be sure it was latched securely. [sgOnce the gate is latched open the morning, he assumes that it will remain so. He conceded that if he saw the gate open, he felt responsible to close it.
He testified about one or two months before the accident, he saw that the gate was open but by the time he got to the gate, the landscapers were in the process of reattaching the gate or they had already done so. He admitted, however, that he did not see the landscapers open the gate. He did not know any of the landscapers but knew that they worked for Stewart Enterprises.
Mr. Gately stated that the cemetery uses many padlocks; they all have the same combination (as opposed to keys). The church was never given the combination. ■ '
Mr. Gately testified that he was never shown the handwritten-drawing from the architect when he began working for FCBA in 2005. He made modifications to the gate to put snap shackles on it in October 2005; someone on his[1] crew did the work. He agreed that, in his opinion, whoever modified the gate would be indicia of ownership. He stated that the gate was originally installed to keep people out of FCBA’s cemetery after hours.
Some of the landscapers employed by Stewart Enterprises and present on the day of the accident, testified at trial. They all stated that a weed eater, not a lawnmower, was used to cut the grass under the gate. They further testified that no one ever unlatched the gate, whether on the day of the accident or at any time beforehand. The man who normally supervised the landscapers, James Marcelon, III, was not on the job site, but stated that unlatching the gate was not necessary. Photographs were admitted into evidence purporting to show lines from a lawnmower underneath the gate when in an open and secured position.
| S3 We recognize that, under the Cherry Street lease, FBCNO had the responsibility to design and construct the gate and a duty to keep all improvements situated on the premises covered by this lease, in good order, condition and repair. No evidence exists in the record that the gate was designed or constructed improperly or that the gate was not’ “in good order, condition, and repair.” Both FCBA and FBCNO acknowledge that they received the architect’s drawings of the tie posts after the 2004 accident and that the plans called for the use of padlocks to secure the gates while open during the day. While that might point to some liability on the part of FBCNO, FCBA assumed the responsibility of the opening and closing the gates every day and made the determination of the means to use to secure the gates open. FCBA never consulted with FBCNO on this issue or even informed it- of the decisions FCBA made in this regard. Despite what the tie post plans called for, Mr. Freese testified that he did not think a *515 padlock was necessary because the snap bolt was sufficient. The snap bolt and fastener were installed by FCBA to secure the gate, not FBCNO.
La. C.C. art. 2317 provides:
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications.
Article 2817.1 provides, in pertinent part, the modification:
The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.
| MThus, the plaintiff must prove three elements: (1) the defendant either owned or had care, custody, or control of the thing in question; (2) the thing was a cause-in-fact of the plaintiff’s injuries;.. (3) the thing presented an unreasonable risk of harm. Gallina v. Hero Lands Co., 03-0331, pp. 4-5 (La.App. 4 Cir. 10/7/03), 859 So.2d 758, 762, citing Baker v. Murphy Oil USA, Inc., 01-1299, p. 5 (La. App. 4 Cir. 4/10/02), 816 So.2d 329, 332. In addition, pursuant to article 2317.1, the plaintiff must prove: (1) that the defendant knew or should have known of the vice or defect; (2) that the damage could have been prevented by the exercise of reasonable care; and (3) that the defendant failed to exercise such reasonable care. Gailey v. Barnett, 12-0830, p. 5 (La. App. 4 Cir. 12/5/12), 106 So.3d 625, 628, writ denied, 12-2761 (La. 2/22/13); 108 So.3d 770.
“[C]ourts have recognized the reality that custody or garde is a broader concept than ownership^] and custody or garde may be shared by multiple parties.” Graubarth v. French Mkt. Corp., 07-0416, p. 4 (La.App. 4 Cir. 10/24/07), 970 So.2d 660, 664. “To determine whether custody or garde is shared, the courts look to the parties’ actions and relationships to the thing causing injury.” Id. “The test for determining custody or garde is two-fold: 1) whether the person bears such a relationship as to have the right, of direction or control over the thing, and 2) what, if any, kind of benefit the person derives from the thing.” Id., 07-0416, pp. 4-5, 970 So.2d at 664.
It is undisputed that FBCNO installed the gates in question. The gates were for the benefit of FCBA so that it could keep church traffic out of the cemetery after hours. After the November 2004 accident, tie posts were installed; both FCBA and FBCNO deny installing them although both entities admit that they saw the plans that called for the use of a padlock on the gates. It was also established 1.¡¡¡that once the tie posts were installed in late 2004, FCBA decided what apparatus to use to secure the gates open during the day. FCBA testified that a padlock was not necessary; the snap bolt was sufficient. No evidence exists to show that once the gate and tie posts were installed, FBCNO did not open or close the gates at any time; this was always done by FCBA. In other words, FCBA had “the right of direction or control over the thing.” .
The jury found FCBA and FBCNO equally at fault. Based on the evidence .in the record, we find that we would not have apportioned fault as did the jury.
*516 By assigning a small percentage of the liability to Stewart Enterprises, the entity responsible for the landscapers, the jury must have believed that the landscapers opened the gate but did not properly secure the snap, bolt upon securing it, thus causing the gate in question to swing .into the access road on which Ms. Plaia was driving.,However, the.decision of whether or not to use a padlock to secure the gate to the tie post was made .solely by FCBA.
■ As noted initially, no defendant appealed the issue of apportionment of fault assigned by the jury; we believe that FBCNO had an excellent argument to reduce or eliminate entirely the finding of fault attributed to it. However, when asked during oral argument why FBCNO did not assign the apportionment of fault as .an error for our review, FBCNO’s counsel stated that a business decision was made not to do so. Therefore, we affirm the apportionment of fault assigned by the jury.

FBCNO’S APPEAL IN No, 2015-CA-1176

In this final appeal, FBCNO objects to the items for which attorneys’ fees, were awarded and the subsequent amounts awarded by the trial court.
A hearing was held on 26 January 2015 on the amounts of reasonable attorneys’ fees due under the jury-rendered judgment of 2 May 2014. The court | fifitook the matter under advisement and entered judgment on 27 August 2015. In the-meantime, FCBA and FBCNO, together with their respective insurers, entered into a stipulation dated 10 February 2015. The stipulation provided that 78% of the Pellet-eri Wiedorn LLC’s billings for attorneys’ fees and costs previously submitted to the court for defending FCBA were properly categorized as “reasonable defense costs” as set forth in the 2 May 2014 judgment. This included billings up to and including 10 June 2014.
The parties also stipulated that all of the attorneys’ fees and cost billings of Bernard J. Rice, including .billings up to and including 10 June 2014, were likewise “reasonable defense costs” as set forth in the 2 May judgment,[20]
No such stipulation was confected between FBCNO and SEFH.
The judgment rendered by the trial court reads as follows:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that as to the claim of S.E. Funeral Homes of Louisiana, L’LC (“SEFH”), there be judgment herein in favor of SEFH and against First Baptist Church of New ’ Orléans Foundation (“FBCNOF”) in the full and true amount of | fi7$336,635.21, together with legal interest from Judgment until paid.
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that as to the 'claim of Firemen’s Charitable and Benevolent Association of New Orleans (“FCBA”)' for attorneys!),,] fees of Bernard J. Rice' III; there be judgment herein in favor of FCBA and against FBCNOF, FBCNO, and Church Mutual in the full amount of $37,451.47, together with legal interest from Judgment until paid.
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that as to the claim of Firemen’s Charitable and Benevolent Association of New Orleans ' (“FCBA”) and United Fire *517 and against FBCNOF, FBCNO, and Church Mutual in the full and true amount of $396,611.56, together with legal interest from Judgment until paid.
IT IS FURTHER HEREBY ORDERED, ADJUDGED AND DECREED that this Judgment does not preclude FCBA, United Fire, or -S<E. Funeral Homes from presenting to the Court hereafter an additional claim for defense costs claim to be, or to have been, incurred.
Since we previously held that the accident occurred on property covered by the Cherry Street lease, the award of attorneys’ fees to SEFH is reversed, and set aside..
In its brief, FBCNO presents the breakdown of FCBA’s billings incurred that were submitted to the trial court by Pellet-eri & Weidorn. These are:
$456,694.55'(fees) +$18,926.44 (costs) for the defense of the Plaia matter. $21,298.50 (fees) + $694.44 (costs) in the pursuit of indemnity under the lease(s).
$10,596.50 (fees) + $265.72 (costs) in pursuit of coverage under the CMIC policy.
[[Image here]]
= $508,476.41
Two days later, FCBA submitted an addendum to include invoices for costs related to the defense of the Plaia matter that were paid by United Fire and FCBA in the amount of $69,551.68. A second addendum was also submitted by FCBA with an additional $19,560.00 (fees) plus $865.09 (costs) for pursuing defense and indemnity from 14 April 2014 through 31 October 2014.
As calculated by FBCNO, and not disputed by its co-defendants, it appears that the trial.court multiplied $508,476,41 (billings. up to 1 June-2014) by 78% (the stipulated- reasonable .fees) for the total of $396,611.56. Apparently the trial court disallowed the,, supplemental fees submitted by ¡United-Fire and FCBA in',their two addenda.
The breakdown of fees and costs by Mr. Rice were as follows: ■ ■
I es$33,676.23 (fees) +$68.99 (costs) for the defense of the Plaia matter.
$2,406.25 (fees) in the pursuit of indemnity under the lease(s). $1,300 (fees) in pursuit of coverage under the CMIC policy.
[[Image here]]
- $37,451.74
FCBA supplemented the record with additional fees incurred by Mr. Rice for pursuing defense and indemnity from 14 April 2014 through 31 October 2014. These fees .were evidently disregarded by the trial court.
FBCNO presents four assignments of error for review. One of these is solely directed- to the award to SEFH; a second has been decided supra. Because we have reversed that award, we pretermit discussion of that alleged error.
FBCNO argues that the trial court erred by awarding attorneys’ fees to FCBA for its defense and pursuing indemnity. We have already held that FBCNO and, thus, CMIC owed a duty to defend FCBA; accordingly, the attorneys’ fees and costs incurred for its direct defense and to pursue its defense under the CMIC policy were correctly awarded by the trial court. However, because we also held that FCBA could not recover indemnity from FBCNO due to its own fault, FCBA cannot recover the costs, and-attorneys’ fees incurred seeking indemnity. -,
*518 Therefore, we recalculate and amend the award for fees and costs through 10 June 2014 to FCBA as follows:
$456,694.55 (fees) +$18,926.44 (costs) for the defense of the Plaia matter. $10,596.50 (fees) + $265.72 (costs) in pursuit of coverage under the CMIC policy.
= $486,483.21 x 78%
[[Image here]]
= $379,456.90 total due to FCBA (Pelleteri & Wiedorn)
Apparently, the trial court disallowed all costs and fees submitted by FCBA after 10 June 2014; we affirm this decision.
|B9The parties stipulated that Mr. Rice would be entitled to the entirety of his fees without reduction. However, we deduct the fees incurred by him for pursuing indemnity under the lease(s). Thus we amend the fees and costs awarded by deleting $2,406.25, arriving at a total award of $35,045.22.
Finally, FBCNO contends that the trial court erred by issuing a judgment that does not preclude FCBA and/or United Fire from presenting to the trial court additional claims for defense costs incurred. We agree.
In Lestelle v. Asbestos Claims Management Corp., 07-1010, p. 16 (La.App. 4 Cir. 10/22/08), 998 So.2d 149, 160, we stated:
Generally, an increase in attorney fees should be awarded when a party who was awarded attorney fees in the trial court is forced to and successfully defends an appeal. See Sam v. Jhane Home Health Care Services, Inc., 95-0081 (La.App. 4 Cir. 6/07/95), 657 So.2d 559.
In Lestelle, given the fact that the appellant was unsuccessful in the consolidated appeals and that it necessitated additional work, we found that an additional award of fees was inappropriate for the appeal.
In the instant cáse, any additional fees and costs would be awarded by this court, if warranted. They are not. First and foremost, in order to obtain additional fees and costs on appeal, an appellee must file an answer to the appeal requesting same. FCBA did not do this. Thus, an additional award of fees and costs is not appropriate.
CONCLUSION
Accordingly we amend the judgments as follows:

Appeal in No. 2014-CA-159

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that all amounts of money awarded by the judgment heretofore rendered and signed are hereby | noset aside and vacated, and this matter is remanded to the trial court for a new trial for the determination of the quantum of damages of Lisa Plaia, Peter Plaia, Petra Plaia, and Carolina Plaia; that insofar as the apportionment of fault between the parties-defendant at the new trial, Stewart Enterprises, Inc. and S.E. Cemeteries of Louisiana, LLC shall be liable for fifteen percent (15%) of the new judgment quantum, Firemen’s Charitable and Benevolent Association and United Fire and Indemnity Company shall be liable for forty-two and one-half percent (42.5%) of the new judgment quantum; and First Baptist Church of New Orleans shall be liable for forty-two and one-half percent (42.5%) of the new judgment quantum; and that legal interest from date of judicial demand and costs are to be assessed on the new trial based upon the awards so determined.

Appeal in No. 2014-CA-07I6

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that *519 Firemen’s Charitable and Benevolent Association and United Fire and Indemnity Company’s Request for Defense, Indemnity, Penalties and Fees is GRANTED in part and that S.E. funeral Homes of Louisiana, LLC’s request for Defense and Indemnity is DENIED. To the extent Firemen’s requests bad faith penalties, that request is DENIED.
Firemen’s Charitable and Benevolent Association is thereby entitled to full reimbursement of its defense costs. First Baptist Church of New Orleans, First Baptist Church of New Orleans Foundation, and Church Mutual are ordered to pay such fees as may be reasonable and appropriate for Firemen’s defense in this matter.
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that First Baptist Church of New Orleans, First Baptist Church of New Orleans Foundation, and Church Mutual owe indemnity to Firemen’s Charitable and Benevolent Association for forty-two and one-half percent (42.5%) of the amount it has been east in judgment in favor of the Plaintiffs.

Appeal in No. 2015-CA-1176

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that as to the claim of Firemen’s Charitable and Benevolent Association of New Orleans (“FCBA”) for attorneys[„] fees of Bernard J. Rice III, there be judgment herein in favor of FCBA and against FBCNOF,_JaFBCNO, and Church Mutual in the full amount of $37,451.47, together with legal interest from Judgment until paid.
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that as to the claim of Firemen’s Charitable and Benevolent Association (“FCBA”) and United Fire for attorneys’ fees, there be judgment in favor of FCBA and United Fire and against FBCNOF, FBCNO, and Church Mutual in the full and true amount of $379,456.90, together with legal interest from Judgment until paid.
Based on the foregoing, we affirm in part; reverse in part; amend in part; and remand' the matter to the trial court for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART; REMANDED.
BAGNERIS, J., CONCURS IN PART ' AND DISSENTS IN PART.
LOVE, J., CONCURS
LOMBARD, J., CONCURS
BONIN, J., CONCURS IN PART AND DISSENTS IN PART WITH REASONS.

. Ms. Plaia’s husband, Peter, along with her minor daughters are also plaintiffs/appellants in the matter.

. First Baptist Church of New Orleans Foundation ("FBCNOF") was the entity that entered into the lease agreements with the other defendants, which FBCNO was the entity that operated the church facility, daycare, and other day-to-day business of the church, These entities operated in concert and, as stipulated at trial, assigned and.assumed each other's rights. These two entities will be collectively referred to as "FBCNO,”

. The installation of the barricade gates is not specified or noted in the Cherry Street lease.

. On 4 November 2004, Holly Broussard intended to visit a gravesite in Greenwood Cemetery when the pole of the gate impaled her vehicle. She was not injured as a result of the impact.

.According to Reverend Moore, the church’s insurance company paid half of the property damage sustained in the 2004 accident; the driver was not injured.

. Motion No. 2014-CM-0632 was filed by FCBA and SEFH, seeking to dismiss the un-lodged appeal (No. 2014-CA-0746) filed by FBCNO, or alternatively, to remand the matter to the trial court. These defendants argued that the 2 May 2014 judgment, wherein the court held that FCBA was entitled to indemnification, as well as full reimbursement of defense costs by FBCNO, and that SEFH was entitled to have all costs of its defense, including attorney’s fees in defense of the underlying matter from FBCNO, was not a final *488 judgment and; therefore, could not be legally appealed. It 'was decided that the writ be referred to the panel assigned .to hear these consolidated cases. We have consolidated Motion No. 2014-CM-0632 with Case Nos, 2014-CA-0159, 2014-CA-0746, and 2015-CA-1176 by separate Order. We deny the motion as moot as the issues raised in No. 2014-CA-0746 were resolved by the appeal in No. 2015-CA-1176.

. On the fifth day of trial, plaintiffs’ counsel stated that they had removed three witnesses due to time constraints; their names are unknown,.

. La. C.E. art. 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay or waste of time.

. In Chauvin v. Chauvin, 10-1055, p. 6, n. 3 (La.App. 1 Cir. 10/29/10), 49 So.3d 565, 570, the court noted that it had adopted the multi-factor analysis utilized by the Goodwin court in an unpublished decision. See Kinney v. Bourgeois, 06-2384, 06-02385 (La.App. 1 Cir. 9/14/07), 962 So.2d 1234 (table), 2007 WL 2686113, writ denied, 07-2026 (La. 1/7/08), 973 So.2d 730.

. When reviewing the record on appeal, we discovered that Dr, Puente's reports were not in the binder of the plaintiffs’ proffered exhibits, although the trial transcript clearly demonstrates that the reports were indeed proffered. As a result, we granted the plaintiffs' motion to supplement the record accordingly,

. While the plaintiffs were required to proffer Dr. Puente’s testimony for appeal, the failure to do so is irrelevant as the issue of damages will be retried.

. See La. C.C. art. 2315 B.

. All throe doctors actually examined the plaintiff on at least one occasion.

. Counsel for FCBA conceded during oral argument that FCBA and FBCNO shared garde over the gate.

. Mr. Hall’s testimony will be discussed in further detail, infra.

. Following the 14 April 2013 trial, which resulted in Np. 2014-CA-0746, FBCNO filed a motion for appeal that was signed by the trial court, Thereafter, the other defendants filed a motion in this court; No. 2014-CM-0632. The motion sought to have the un-lodged appeal dismissed or, in the alternative, to remand the matter to the trial court. The movers argued that the judgment by the trial court was not a final judgment because it did not determine the actual amounts due them for indemnity and defense costs. The court referred the motion to the panel hearing the consolidated .-appeals, -Because the last judgment, No. 2015-CA-1176', did in fact set those , amounts, we find that the motion is moot.

. The trial court also held that FBCNO and CMIC were not in bad faith in. denying a defense;. this issue is not before the court.

. We affirmed, in part, the trial court's judgment that FBCNOF, FBCNO and CMIC owe a duty of defense to FCBA. This would include a defense on the new trial for damages. We recognize, however, that further indemnity and attorneys’- fees may be due to FCBA depending on the outcome of the new trial.

. Mr, Hall is an architect and engineer with two degrees in Architecture, Masters of Sciences in Landscape Architecture and Systems Management, as well as a Ph.D. in Urban Studies.

. In connection with the retrial on damages, additional attorneys’ fees may be- owed to both FCBA and Mr. Rice.

. I am not persuaded that the application of the Sublease and the Cherry Street Lease are necessarily mutually excluded,